UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
-------------------------------------------------------x
                                                       :
BLACK SHIP, LLC, 33 TAPS, LLC, and                     :
HINOKI & THE BIRD, LLC, individually              :
and on behalf of all others                            :
similarly situated,                                    :
                                                       :        CLASS ACTION COMPLAINT
                                                       :
                        Plaintiffs,                    :
                                                       :        Civil No.:
            v.                                         :
                                                       :
HEARTLAND PAYMENT SYSTEMS,                             :
INC.,                                                  :
                                                       :
                        Defendant.                     :
                                                       :
-------------------------------------------------------x
```

Plaintiffs Black Ship, LLC ("Black Ship"), 33 Taps, LLC ("33 Taps"), and Hinoki & the

Bird, LLC ("Hinoki") bring the claims set forth below against Heartland Payment Systems, Inc.

("Heartland").

## Nature of the Action

1.      Plaintiffs, individually and on behalf of all others similarly situated, bring this

action against Heartland, a payment card processor that operates throughout the United States.

2.      Heartland markets its credit and debit card processing services to small and

medium-sized businesses (referred to as "merchants" by Heartland) by claiming that its fees are

fair, and its billing practices are transparent. Heartland assures merchants it does not engage in a

common industry practice: charging merchants hidden and confusing "junk" fees.

3.      To promote its "fairness and transparency" claims, Heartland represents to its

merchants that it will "adhere to" a "Merchant Bill of Rights". Heartland also created related

advertising campaigns, marketing materials, and a web site[1] to promote its fair and transparent fee structure and to distinguish itself from competitors. Heartland even registered a trademark for this "public advocacy initiative" and references its commitments in its agreements.

4.       However, Heartland abandoned any semblance of honest or transparent billing practices by charging merchants extra fees and burying those charges within a labyrinthine of other charges in monthly statements. By imposing new fees without the required notice, Heartland flagrantly disregarded the promises and agreements it made to Plaintiffs and other merchants.

5.       Merchants who process credit and debit card transactions through Heartland execute an application and disclosure form ("Application") which references a Merchant Processing Agreement ("Agreement") setting forth the fees that Heartland will charge the merchant and automatically deduct from the merchant's bank accounts.  As set forth in the Agreement, Heartland keeps a portion of the fees, and remits the balance of the fees to other parties (such as Visa, MasterCard and American Express).

6.       The Application and Agreement between Heartland and its merchants could only be amended in writing, and required notice to the merchant. Specifically, the Agreement requires that if Heartland were to change the fees it charges, Heartland was required to provide an "Amended Schedule of Fees[2]" and provide a written notice by first-class mail[3] with the exact date on which the Amended Schedule of Fees would be effective.

---

[1] *See* www.MerchantBillOfRights.com

[2] This provision is in the Merchant Processing Agreement at § 6.2.

[3] This provision is in the Merchant Processing Agreement at § 14.1 and requires "All notices and other communication required or permitted under this Agreement shall be deemed delivered when mailed first-class mail, postage prepaid, addressed to the Merchant at the address stated in the Application…" Heartland failed to mail any notice to Plaintiffs.

7.      But, without asking its merchants to sign new agreements authorizing Heartland to charge additional fees, and without providing the required Amended Schedule of Fees or the written notice, Heartland has unilaterally imposed additional fees on its merchants, dramatically increasing Heartland's fees at the expense of Plaintiffs and other merchants.

8.      For example, in July 2019 Heartland began charging Plaintiff Black Ship and other merchants a monthly $125 "PCI Non-Compliance Fee" ("PCI Fee") that was not authorized by, or set forth in, Plaintiff Black Ship's Application or Agreement.  Heartland assessed a PCI Fee on Plaintiff Black Ship for a total of approximately $1,500.

9.      Heartland also charged a PCI Fee to Plaintiff 33 Taps. Even in December 2020, during the COVID pandemic when Plaintiff 33 Taps was required to temporarily close by government order (and did not process any transactions), Heartland charged Plaintiff 33 Taps (and other merchants temporarily closed due to COVID) a PCI Fee.

10.     Heartland imposed the PCI Fee without providing the required notice or the Amended Schedule of Fees to Plaintiffs or to Heartland's other merchants and without having Plaintiffs or the other merchants sign an amended Merchant Processing Agreement.

11.     Similarly, Heartland charged Plaintiffs Black Ship and 33 Taps and other Heartland merchants a $69 "Reporting Fee" ("Reporting Fee") in December 2019 that was not authorized by, or set forth in, the Application or Agreement (or in agreements with Heartland's other merchants).

12.     Heartland never had Black Ship or 33 Taps or other merchants sign an amended Merchant Processing Agreement and never sent an Amended Schedule of Fees setting forth the Reporting Fee.

13.     Even in December 2020, during the COVID pandemic when 33 Taps was closed and processed no transactions, Heartland charged 33 Taps and other merchants a Reporting Fee.

14.     Heartland agreed to a no-cost "Service/Mandate Fee" for Plaintiffs (documented as $0.00 in the Application) and other Heartland merchants. However, Heartland began charging a monthly $8.50 "Service & Regulatory Mandate" fee ("Regulatory Fee"). Despite its misleading description, no governmental authority or regulator has imposed such a fee.  The Regulatory Fee exceeds $100 annually for Plaintiffs and other Heartland merchants, as evidenced by Plaintiff Hinoki's December 2019 Heartland statement.

15.     Heartland never obtained Plaintiffs' (or other merchants') agreement to a Regulatory Fee, or their signature on an amended Merchant Processing Agreement. Heartland also failed to provide an Amended Schedule of Fees setting forth the Regulatory Fee.

16.     Heartland also began imposing on its merchants a monthly $54.95 "Customer Intelligence Suite" fee.  This fee was not included in Plaintiffs' Application or Agreements or in Heartland's agreement with its other merchants.  For example, Heartland began charging Plaintiff Black Ship in August 2020 a monthly $54.95 Customer Intelligence Suite fee that was not authorized by, or set forth in, Plaintiff Black Ship's Application or Agreement.  Heartland unilaterally imposed more than $650 in additional annual Customer Intelligence Suite fees on Black Ship and other merchants for a purported service they never requested. Heartland never had Plaintiff (or other merchants) sign an amended Merchant Processing Agreement detailing this additional charge and never sent an Amended Schedule of Fees setting forth the Customer Intelligence Suite fee. (As set forth below, Heartland later refunded Plaintiff Black Ship the Customer Intelligence Suite Fee.).

17.     Beginning in April 2021 Heartland began adding a 0.65% (65 basis points) fee on the gross charges of all non-EMV transactions processed by its merchants "Non-EMV Assessment Fee" and a $25 "Non-EMV Program Fee" to merchants' bills.  As set forth below, the fees were not included in Plaintiffs' Application or in their Agreement and Heartland did not have the Class member merchants sign an Amended Merchant Processing Agreement authorizing these charges and never sent an Amended Schedule of Fees setting forth the Non-EMV Assessment Fee and Non-EMV Program Fee.

18.     Heartland charged the Non-EMV Assessment Fee and Non-EMV Program Fee to Plaintiffs Hinoki and 33 Taps starting in April 2021.  For April 2021 Heartland credited back the Non-EMV Assessment Fee, but indicated that it would charge the fee going forward.

19.     In May 2021, Heartland charged Plaintiffs Hinoki and 33 Taps a Non-EMV Assessment Fee, meaning that Heartland charged Plaintiff Hinoki an additional $1,737.60 fee for that month alone as the Non-EMV Assessment Fee.  Heartland also charged Plaintiff Hinoki a $25 Non-EMV Program Fee in May 2021.

20.     Similarly, Heartland charged Plaintiff 33 Taps $385.96 in May 2021 as a Non-EMV Assessment Fee and also charged 33 Taps a $25 Non-EMV Program Fee in May 2021.

21.     Each of these fees was unauthorized, violated Plaintiffs' Agreement, and was imposed by Heartland without proper notice and without providing an Amended Schedule of Fees or an amended Merchant Processing Agreement.

22.     Heartland charged these fees to its merchants, often amounting to hundreds or thousands of dollars of extra fees for each merchant each month.

23.     By charging its merchants these fees, Heartland increased its revenues by tens or hundreds of millions of dollars, violated its contracts with its merchants, and reneged on its representations to those merchants.

24.     Plaintiffs, individually and on behalf of all of Heartland's merchant customers in the Class (as defined below), bring this proposed class action on behalf of themselves and the other merchants in the proposed Class whom Heartland charged these fees.

25.     Plaintiffs bring claims against Heartland for breach of contract, breach of the implied covenant of good faith and fair dealing, violating the New Jersey Consumer Fraud Act, and for unjust enrichment.

**Parties**

26.     Defendant Heartland is a Fortune 1000 company organized under the laws of the state of Delaware with its principal place of business at 90 Nassau Street, Princeton, New Jersey. It processes credit cards and debit cards for approximately 275,000 merchants and it operates throughout the United States.

27.     Plaintiff Black Ship, LLC is a California limited liability company =.  It operates a restaurant known as Blackship and has its principal place of business at 8512 Santa Monica Blvd, West Hollywood, California.

28.     Plaintiff 33 Taps, LLC is a California limited liability company.  It operated a bar and restaurant known as 33 Taps Hollywood and had its principal place of business at 6263 Hollywood Blvd, Los Angeles, California.

29.     Plaintiff Hinoki & the Bird, LLC, is a California limited liability company. It operates a restaurant known as Hinoki & the Bird with its principal place of business at 10 West Century Drive, Los Angeles, California.

30.     During the time period at issue in this lawsuit each Plaintiff processed its credit card and debit card transactions through Heartland.

## Jurisdiction and Venue

31.     This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiffs are California limited liability companies. Heartland is a citizen of New Jersey. The amount in controversy in this action exceeds $5,000,000 and there are more than 100 members of the Class.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Heartland resides in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and Heartland is subject to personal jurisdiction in this District. Venue is also proper in this District because §§ 15, 13 of Plaintiffs' Merchant Processing Agreement provides that any lawsuits arising from the Agreement shall be brought in this District.

## Factual Background

### I.     *Heartland's Payment Processing Business*

33.     Heartland is engaged in the business of electronic payment processing, which involves processing credit card and debit card transactions for merchants who accept those forms of payment.

34.     Payment processors (or "merchant acquirers") such as Heartland provide services to merchants to ensure that transactions are properly credited to the merchant and charged to the customer through the bank or institution that issued the customer's credit or debit card. Each time a customer's credit card or debit card is swiped through a terminal at a store, restaurant, or other place of business, information is accumulated to be transmitted through the payment processing system so that the merchant can receive the proceeds of the transaction, the issuing institutions

(*i.e.,* Wells Fargo, Chase, etc.) and card brands (*i.e.*, Visa, MasterCard, Discover, American Express) can receive their fees, and the customer's account can be correctly and appropriately charged. Payment processors such as Heartland act as intermediaries between these various entities.

35.    A substantial part of Heartland's processing business is focused on providing various services and solutions to small and medium-sized enterprises ("SME"), especially in the restaurant, lodging and hospitality, and retail sectors.

36.    Most Heartland's customers in these sectors are small chains or independent locations, and not part of national chains. These kinds of businesses typically operate on thin profit margins, so that even a small difference in the cost of processing services matters greatly to these merchants. These kinds of businesses, which typically are owned and managed by a single person or a small group of entrepreneurs, are especially vulnerable to the predatory and deceptive practices in which Heartland has engaged, as alleged herein.

37.    During the time period at issue in this lawsuit, Heartland provided card payment processing services to more than 275,000 active SME merchants across the United States.

38.    Heartland's card payment processing revenue from SME merchants is recurring in nature. Heartland typically enters into three-year contracts with SME merchants.

39.    Most of Heartland's SME revenue is from fees for processing transactions, which are primarily a combination of a percentage of the dollar amount of each transaction Heartland processes, plus a flat fee per transaction.

40.    Heartland makes mandatory payments of interchange fees to card issuing banks through card networks and dues, assessments and transaction authorization fees to Visa, MasterCard, and Discover, and retains the remainder as its net revenue.

41.    In addition to interchange fees, Heartland also charges access fees, also referred to in the payment card industry as "dues and assessments". These fees are established by Visa, MasterCard, American Express, and Discover as a percentage of each transaction. These fees are paid by merchants and collected by payment card processors like Heartland, and distributed to the card associations. Heartland does not have authority to increase or decrease these fees.

42.    Interchange fees are established and published by card associations, such as Visa, MasterCard, or American Express, but are distributed to card-issuing banks or financial institutions instead of to card associations.

43.    For example, in a transaction using a Visa or MasterCard credit card, the funds from a $100 transaction would be allocated as follows:



44.    By increasing the fees that it charged merchants like Plaintiffs, as alleged in this Complaint, Heartland was able to increase its revenues at the expense of Plaintiffs and other merchants.  The additional fees charged by Heartland that are at issue in this Complaint went directly to Heartland.

## II.    *The Changing Landscape of Payment Processing*

### A.    **The Durbin Amendment**

45.    The payment processing industry has been greatly affected by the so-called Durbin Amendment to the 2010 Dodd-Frank Act, which set limits on interchange fees paid by merchants to large banks to process debit card purchase transactions.

46.    The Durbin Amendment directs the Federal Reserve Board to regulate debit card interchange fees so that they are "reasonable and proportional to the cost incurred by the issuer with respect to the transaction."

47.    Before the Durbin Amendment, many processors hid the true cost of interchange fees from their merchant customers and did not show the true rate mix or pricing on their statements. Under the Durbin Amendment, however, payment processors are obligated by law not to over-charge for interchange rates on regulated debit purchases. These reduced rates often appear on statements as a refund or rebate, usually as an item marked "Durbin Rebate", or identified in the interchange category breakdown as "regulated debit".

48.    Prior to the Durbin Amendment, the "swipe fee" for each debit card transaction averaged 44 cents. After the Durbin Amendment, the Federal Reserve set a cap of 21 cents per transaction, plus .05% (5 basis points) of the transaction total.

49.    While the Durbin Amendment applies only to Visa and MasterCard debit cards — not credit cards — and only to issuing non-exempt institutions with $10 billion or more in total assets, it has substantially affected the payment processing industry by preventing processors like Heartland from tacking on fees to the interchange cost.

50.     Although the Durbin Amendment has reduced processors' debit fees, processors (or the networks) found other ways to circumvent the Durbin Amendment—finding a "loophole" to charge merchants even more fees.

51.     For instance, Visa and MasterCard have eliminated the discounts they previously offered on interchange for small transactions -- those under roughly $10. Instead, the credit card companies now charge many small businesses a fee of cents on the dollar as allowed by the law.

52.     Indeed, a recent study conducted by the Federal Reserve Bank of Richmond found that the regulation has had a limited effect on merchants. In a sample of 420 merchants across 26 sectors, two-thirds reported no change or did not know the change of debit costs after the regulation. One-fourth of the merchants, however, reported an increase of debit costs. The study suggests that the regulation has backfired.

### B.     Heartland Faced Increased Competition Leading Up To, And During, the Class Period

53.     Heartland is one of the largest payment processors in the world.

54.     During the time period at issue in this lawsuit Heartland was facing increasing competition from other payment processing companies that were expanding their business among SME merchants.

55.     For instance, in 2014, Heartland filed an antitrust lawsuit against Mercury Payment Systems, LLC, a company that competes directly with Heartland in providing processing services to SME merchants, particularly restaurants and retail stores. Heartland described Mercury as a competitor that had quadrupled in size over four years, both in the volume of transactions and the number of merchant outlets to which it provides services. In order to check this competition, Heartland filed an antitrust lawsuit against Mercury claiming that Mercury had been charging

customers undisclosed fees. As alleged below, Heartland would later do something similar itself by charging Plaintiffs and Heartland's other merchant improper fees.

56.     Heartland has also been encountering intense competition from disruptive entrants into the payment processing business. For instance, in 2010, Square entered the market and began processing payments for "micro-merchants" by creating software that permitted merchants to use mobile devices to process payments, rather than require these small businesses to acquire costly hardware. For Visa and MasterCard transactions, Square became an "aggregator" for merchants with less than $100,000 in transactions, which allowed merchants to forego applying for Merchant IDs and process with Square in a matter of minutes instead of days.

57.     The growth of Square has been extraordinary and has led to copycat payment processing businesses competing for the business of the same SME merchants that have historically formed the majority of Heartland's client base.

58.     Prompted by increasing competition and a desire to increase its revenues, Heartland increased and added to the fees it charged Plaintiffs and its other merchants to increase its profits. Specifically, Heartland imposed the additional fees that are at issue in this lawsuit: the PCI Fee; the Reporting Fee; the Regulatory Fee; the Customer Intelligence Suite Fee; the Non-EMV Assessment Fee; and the Non-EMV Program Fee (collectively the "Unauthorized Fees").

59.     Heartland either misrepresented or failed to properly disclose the Unauthorized Fees.  Heartland charged the Unauthorized Fees to Plaintiffs and other merchants and, upon information and belief, kept a majority of the Unauthorized Fees for itself.  Moreover, Heartland imposed the Unauthorized Fees without first obtaining written agreement from Plaintiffs and other merchants and without first providing Plaintiffs and other merchants with an Amended Schedule of Fees and proper notice of that amendment.

### III.    *Heartland's Purported Transparency Policy*

60.    Processing services are sold with a variety of pricing approaches for merchants, including flat and tiered discount rates. However, in recent years, Heartland has priced SME merchants increasingly on a cost-plus basis. Issuing institutions charge certain fees when cards that they issue are used, generally calculated as a percentage of the transaction plus a per-transaction fee. Those fees vary based on the type of card used (*e.g.*, a merchant will pay a different fee for transactions in which a basic bank credit card is used than for transactions in which a rewards card, for which the user receives a cash-back rebate, airline miles, or similar benefit is used). Similarly, the merchant will pay a much lower fee for a debit card transaction than for a credit card transaction. These fees, charged by the card issuers, are referred to as "interchange" fees.

61.    The card networks (*e.g.,* Visa and MasterCard) also charge fees, including fees that are assessed on a per-transaction basis. For example, Visa charges a fee known as the "APF" (or "Acquirer Processing Fee") and MasterCard charges a fee known as the "NABU" (or "Network Access Brand Usage") fee. The card brands charge additional fees for particular kinds of transactions or events, such as transactions in which a customer's credit card is declined. All of those fees, charged by the card brands, are known as "network" fees.

62.    As interchange and network fees are established by the card networks, apply identically, regardless of the acquirer of the transaction, and are outside the control of those acquirers (or the merchants), they are often combined colloquially and described as "interchange" fees. Thus, the "interchange-plus" pricing model that Heartland and others offer to merchants means that the acquirer: (1) will pass through **at cost** the uncontrollable interchange and network fees to the merchant; and (2) will add a separate mark-up, usually in some

combination of basis points and cents-per-transaction, that is supposed to represent the amount the acquirers are being paid for their services.

63.     The purpose of the "interchange-plus" pricing model is twofold: (1) to provide pricing transparency; and (2) to allow an "apples-to-apples" comparison of processing costs between other processors. Simply put: interchange-plus pricing allows merchants to see how much they are paying the card brands/networks, and how much they are paying processors like Heartland. This is supposed to protect SME's like Plaintiffs from hidden fees, predatory practices, and arbitrary and hidden price increases. And certainly, it is to ensure that merchants receive the full benefit of protections mandated by law, such as the Durbin Amendment.

64.     In accord with its purported transparency policy, Heartland promises "full and honest disclosure with easy-to-read statements" as well as "fairness and transparency." *See* Merchant Processing Agreement, page 2 of 29.

65.     Heartland has promulgated a "Merchant Bill of Rights." Among other things, the Merchant Bill of Rights discusses the issue of undisclosed fee markups by processors, stating that merchants have the "right to know the markup on Visa, MasterCard, American Express and Discover Network fee increases", as well as the "right to know all surcharges and bill-backs."  See Merchant Processing Agreement at page 2 of 29.

66.     By imposing the Unauthorized Fees on Plaintiffs and other merchant as alleged in this complaint, Heartland is engaging in precisely the kind of improper and deceptive conduct against which its Merchant Bill of Rights is supposed to protect.

### IV.    *Heartland Imposes Unauthorized Fees On Its Customers*

67.     While proclaiming that it has passed the Durbin Amendment savings to its

merchants, Heartland has then billed Plaintiffs and other merchants additional Unauthorized Fees that impose an even greater burden than Plaintiffs and other merchants faced before the Durbin Amendment.

68.    Heartland has recently responded to increasing competition and has increased its profits by charging Plaintiffs and other merchants the Unauthorized Fees that are not set forth in the Agreement.  Those fees include the PCI Fee, the Reporting Fee, the Regulatory Fee, the Customer Intelligence Suite Fee, the Non-EMV Assessment Fee and the Non-EMV Program Fee.

69.    Heartland did not, however, properly disclose the new or increased fees, it did not obtain a written agreement from Plaintiffs or its other merchants authorizing such fees, and it did not send an Amended Schedule of Fees together with a specific effective date to Plaintiffs and or other merchants before imposing the fees.

70.    Heartland's attempt to create a new cash cow breached the terms of its contracts with its merchants, misrepresented its fees, and contradicted Heartland's representations to Plaintiffs and the Class (defined below).

71.    Although the amount of the Unauthorized Fees may differ between merchants, Heartland implemented the fees in a common way for the merchants in the proposed Class (defined below).

72.    Heartland imposed the Unauthorized Fees unilaterally and without first obtaining written consent from its merchants and without giving proper notice to merchants, including providing an Amended Schedule of Fees before Heartland began charging the fees.

73.    The Terms and Conditions of each SME merchant's contract required that Heartland provide at least fifteen days' written notice before any change to the fees or rates. Heartland's decision to impose additional fees (and the Unauthorized Fees) without proper notice

violated Heartland's contract with its merchants, including the Terms and Conditions, as well as its representations to its merchants.

74.    By imposing the Unauthorized Fees, Heartland effectively (but improperly) charged Plaintiffs and the Class at a higher rate for processing transactions than it should have charged. This directly contradicted Heartland's representations to Plaintiffs and the Class and it contradicted the Schedule of Fees to which Plaintiffs and other merchants agreed when they contracted with Heartland.

75.    The Unauthorized Fees often amounted to hundreds or thousands of dollars in extra monthly charges for each merchant.

76.    The Unauthorized Fees created tens or hundreds of millions of dollars of unauthorized income for Heartland at the expense of Plaintiffs and Heartland's other merchants who processed transactions.

### A.    The $125 Monthly PCI Non-Compliance Fee

77.    Plaintiff Black Ship never agreed to pay a PCI Fee or any other fee amounting to $125 per month.

78.    The PCI Fee was not included in Plaintiff Black Ship's Schedule of Fees with Heartland or an Amended Schedule of Fees.

79.    In Plaintiff Black Ship's July 2019 electronic statement[4], which Black Ship obtained sometime after July 31, 2019, Heartland embedded a non-searchable "text-image" on page 2 of this electronic statement. Within the second sentence of the third paragraph of the five-paragraph "text-image" Heartland stated: "…Heartland has assessed your account a PCI Non-

---

[4] Black Ship did not receive any paper statements by USPS mail. Rather, when Black Ship contacted Heartland, it was referred to a web site to download electronic statements as a reference.

Compliance fee, in the amount of $125, which will be reflected as a separate line item on your

merchant statement reflecting August 2019 activity.  This amount will continue to be assessed

In 2017 Heartland began partnering with ControlScan, a Qualified Security Assessor (QSA) and Approved Scanning Vendor (ASV), to offer the Merchant Protection Program to our merchants. The Merchant Protection Program is intended to help Heartland's merchants obtain PCI Data Security Standard (PCI DSS) compliance validation and report that compliance status back to Heartland. As small and medium-sized businesses are vulnerable to hackers, breaches and cyber-attack, PCI compliance is critical.  Further, the card brands mandate that acquirers (like Heartland) report on the PCI DSS compliance of their merchants.

Though we do offer our Merchant Protection Program (administered through ControlScan) as a convenience to our merchants, your business is not required to use this offering.   You are required, however, to assess your compliance status and provide Heartland with confirmation of your PCI compliance status.  In some cases, you may do this on your own, or you may require the assistance of an authorized service provider, whether ControlScan or another provider.

As of July 31, 2019, we have not received your PCI DSS compliance validation, and your account is in a non-compliant status.  As a result, Heartland has assessed your account a PCI Non-Compliance fee, in the amount of $125, which will be reflected as a separate line item on your merchant statement reflecting August 2019 activity.  This amount will continue to be assessed monthly until you have provided your PCI DSS compliance validation.

If you are working with ControlScan, and have questions about your compliance status, please feel free to contact them at (800) 477-3590 – 1 (Support).

If you object to these fees, you may terminate your agreement without penalty by providing written notice in accordance with your agreement within 30 days of the date of the statement containing this fee.  As a reminder, please note that you must provide notice of any errors, improper charges or other issues with your merchant statement within 90 days of the date of the merchant statement.

monthly until you have provided your PCI DSS compliance validation." A copy of the "text-

image" is below:

80.      This message was buried in a non-searchable text-image embedded on page 2 of a

multiple-page document and there was no highlighting or bolding of the text to alert Black Ship to

the PCI Fee that Heartland planned to unilaterally impose on Black Ship and other merchants.

81.      Before imposing this fee, Heartland did not contact Plaintiff Black Ship or—as

required by the Agreement—send via first class mail a stand-alone notice to Plaintiff Black Ship

about this material change in the fees that Heartland would impose on Plaintiff Black Ship.

Heartland did not provide an Amended Schedule of Fees to Plaintiff Black Ship containing or

disclosing the PCI Fee before imposing that fee.

82.     Moreover, by the time Heartland made this account statement available to Plaintiff Black Ship (and made similar account statements available to the other Class members) Heartland had already imposed the PCI Fee on Plaintiff and other merchants for July 2019.

83.     In fact, the next month's account statement, for August 2019, showed that for July 2019, even before Heartland had notified Plaintiff Black Ship of the charge, Heartland charged Plaintiff Black Ship a PCI Fee for July 2019.  In that August 2019 statement (page 4 of 6) the July 2019 charge appeared as "Monthly PCI non-Compliance Fee – Jul[y]".  The $125 charge was mixed in and comingled with seven other "Heartland Processing Fees".

84.     Heartland never entered a written agreement in which Plaintiff Black Ship agreed to pay this PCI Fee.

85.     Heartland continued charging a PCI Fee to Plaintiff Black Ship every month, totaling more than $1,500 per year.

86.     Similarly, Heartland charged Plaintiff 33 Taps a PCI Fee, including during the COVID pandemic when the restaurant operated by 33 Taps was closed by government orders, and did not process any transactions.  *See* Heartland's April 2020 account statement for 33 Taps reflecting that Heartland imposed the fee for March, 2020 (page 3 of 4) (indicating that the PCI Fee was for March, 2020).

87.     Heartland did not obtain an amended Merchant Processing Agreement from Plaintiff 33 Taps providing for a PCI Fee.

88.     Before imposing the PCI Fee, Heartland did not provide Plaintiff 33 Taps with an Amended Schedule of Fees containing the PCI Fee.

### B.     The Improper and Unauthorized $69 "Reporting Fee"

89.    In December 2019 Heartland charged Plaintiffs and Heartland's other merchants a $69 Reporting Fee that was not authorized by, or set forth in, the Agreement or Heartland's contracts with other merchants.

90.    For example, in December 2019 Heartland imposed a Reporting Fee on Plaintiff Black Ship. *See* Black Ship December 2019 Account Statement at page 4 of 5.

91.    Heartland buried the Reporting Fee on page 4 of 5 of the December 2019 account statement.

92.    Similarly, in December 2020 Heartland charged Plaintiff 33 Taps a Reporting Fee. *See* the 33 Taps December 2020 Account Statement at page 3 of 4. At the time, the restaurant operated by Plaintiff 33 Taps did not process any transactions, as it was closed.

93.    The Reporting Fee was not one of the fees to which Plaintiffs Black Ship or 33 Taps agreed in their Agreement.  Moreover, Heartland did not provide the required notice to Plaintiffs or its other merchants before imposing the Reporting.

94.    Heartland did not obtain a written amended Merchant Processing Agreement from Plaintiffs Black Ship or 33 Taps which agreed to the Reporting Fee.

95.    Similarly, Heartland did not provide Plaintiffs Black Ship and 33 Taps with an Amended Schedule of Fees containing the Reporting Fee.

### C.    The $8.50 Service And Regulatory Mandate Fee

96.    For certain merchants, including Plaintiff Hinoki, Heartland also began charging a monthly $8.50 Regulatory Fee.  Yearly, this fee exceeded $100 for Plaintiff Hinoki and other merchants.

97.     Heartland never asked Plaintiff Hinoki or other merchants to sign an amended Agreement increasing the Regulatory Fee and never sent an Amended Schedule of Fees setting forth the $8.50 increase in the Regulatory Fee.

### D.     The $54.95 Monthly "Customer Intelligence Suite" Fee

98.     Also in 2019, Heartland began imposing on its customers a charge for a "Customer Intelligence Suite."  This fee was not included in the list of fees in the Agreement. Regardless, Heartland began imposing this charge on Plaintiff Black Ship and other merchants.

99.     Heartland eventually refunded to Plaintiff Black Ship the Customer Intelligence Suite Fee that Heartland had charged Plaintiff Black Ship.

100.     However, as set forth below, Heartland continued to charge other merchants the Customer Intelligence Suite Fee.

### E.     The Non-EMV Program Fee and Non-EMV Assessment Fee

101.     Beginning in April 2021 Heartland began charging merchants in the Class a Non-EMV Assessment Fee and a Non-EMV Program Fee (collectively "Non-EMV Fees").

102.     Heartland charged these fees to Plaintiffs Hinoki and 33 Taps.

103.     For example, in Plaintiff Hinoki's April 2021 account statement, which Heartland would have made available to Hinoki after April 2021, Heartland included the Non-EMV Fees.

104.     On page 2 of 6 of that statement Heartland embedded a non-searchable text image.  In the seventh paragraph of that second page, Heartland stated:

> "as previously announced, beginning April 1, 2021, and for each month thereafter, we will be assessing a Non-EMV Assessment Fee of 0.65% of all non-EMV transactions for the four major card brands.  We value your partnership and want to provide the best support possible to keep your business safe and thriving. In order to give you more time in your compliance efforts, we have paused the Non-EMV Assessment Fee for the month of April by offsetting it with a credit in the same amount.  ... If you object to these fees, you may terminate your agreement without penalty by providing written notice in accordance with your

merchant agreement within 30 days of the date of the statement containing the fees."

105.     In April 2021, Heartland charged Plaintiff Hinoki a Non-EMV Assessment Fee of $904.25 plus a Non-EMV Program Fee of $25.  As it mentioned in the statement on page 2, for April 2021 Heartland issued a credit adjustment of $904.25 for that month's Non-EMV Assessment Fee.  However, Heartland did not credit back the $25.00 Non-EMV Program Fee to Plaintiff Hinoki.  Instead, Heartland continued to charge the Non-EMV Fees going forward as alleged below.

106.     For example, in May 2021 Heartland charged Plaintiff Hinoki a $1,737.60 Non-EMV Assessment Fee (which is 65 basis points) and a $25 Non-EMV Program Fee. Similarly, in May 2021 Heartland charged Plaintiff 33 Taps a $385.96 Non-EMV Assessment Fee (which is 65 basis points) and a $25 Non-EMV Program Fee.

107.     Heartland refused to refund the Non-EMV Fees or to stop charging the Non-EMV Fees.

108.     Plaintiffs Hinoki and 33 Taps and the other Plaintiffs and merchants in the Class did not agree to the Non-EMV Fees charged by Heartland.

109.     Before imposing the Non-EMV Fees on Plaintiffs Hinoki and 33 Taps and the other merchants in the Class, Heartland did not have those merchants sign an amended Agreement and Heartland did not, as required, send to them an amended Schedule of Fees about this material change in the fees that Heartland would charge.

110.     Moreover, by the time that Heartland made the account statements available to Hinoki and 33 Taps and to other merchants in the Class, Heartland had already imposed the Non-EMV Fees on Plaintiffs Hinoki and 33 Taps and other merchants in the Class.

111.     It is no answer and is a breach of contract and is misleading for Heartland to charge these unauthorized Non-EMV Fees and then for Heartland to say that a merchant can terminate the agreement without penalty under certain conditions and within restricted time limits.

112.     Plaintiffs and Heartland's other merchants in the Class negotiated for processing services through Heartland and agreed to certain fees but did not agree to the Non-EMV Fees.

113.     It is improper for Heartland to charge the unauthorized fees and then put the burden on the merchants to uncover the fees that are buried in the account statements and then impose a limited time period in which to terminate the agreement.

114.     Heartland profited enormously by unilaterally imposing these fees on its merchants, even if Heartland only charged the fees to a percentage of its merchants.

### F.     These Improper Charges May Impact Tens of Thousands of Merchants

115.     During the time period at issue in this lawsuit, Heartland processed transactions for more than 275,000 merchants.

116.     If, for example, 275,000 merchants processed transactions with Heartland and were charged on average a $125 monthly PCI Fee per merchant, those additional charges for one month alone would have meant an extra $34,000,000 of revenue for Heartland each month or more than $412 million per year.  If Heartland charged only a quarter of its merchants this fee (approximately 68,750 merchants) that would be $8.5 million per month or $103 million per year in charges by Heartland that it kept for itself.  The other improper fees, including the Non-EMV Assessment Fee and the Non-EMV Program Fee, would create even more revenue for Heartland at the expense of its merchants.

117.    Heartland continues to charge Plaintiffs and the Class these improper fees, increasing Heartland's revenue in violation of Heartland's representations and the Agreement, and damaging Plaintiffs and the Class.

118.    Heartland's improper and deceitful conduct has benefitted Heartland and damaged Plaintiffs and the Class.

> ### G.    Merchants Throughout The Country Were Complaining About The Improper Heartland Fees

119.    Other Heartland merchants repeatedly complained to Heartland and to the Better Business Bureau (which in turn contacted Heartland) about being improperly charged by Heartland for the same types of fees that are at issue here.

120.    For example, on February 11, 2021 a merchant named ABD Transmission, Inc. complained to the Better Business Bureau about Heartland's improper PCI Fee and Customer Intelligence Suite Fee:

> **Well, it has come to my attention after an audit has been done to my checking account end of yr. found out that heartland has been charging use 125.00 noncompliance of PCI**.  We are in fact compliant, we just received an email stating that we will be in noncompliance in 2 14 2021 so I went in and tried to do the survey it said I was good they would do a scan then let me know the results it came back that I was good just need a signature to compete. Tried to do this for 3 days. Could not get it done do to incompetence on their end so I started to ask about the refund of 125.00 for 13 months they said they would give back a small portion of it. The only thing I would have to do is sign a 2year contract. I am not willing to sign a contact with them I am going to go elsewhere so then they said I can cancel out but there is an early cancellation fee of 300.00.  I am not ok with any of these sounds like they are trying to bully me into staying. **I just want the 13 months of 125.00 to be paid back to the heartland marketing solutions fee be refunded of 54.95 for 6 months** and cancel my contract with no fee.

(emphasis supplied).

121.    On February 16, 2021, while Heartland attempted to justify the PCI Fees and

Customer Intelligence Suite Fees, its still offered to refund certain of those fees "in a gesture of

goodwill".  Specifically, Heartland responded by saying:

> Heartland Payment System LLC ("Heartland") has researched this
> complaint and Heartland disputes the facts and circumstances
> raised therein.  Pursuant to the terms of the Merchant Processing
> Agreement (the "Agreement") by and between Heartland and ABD
> Transmission Inc. ("Merchant"), including without limitation
> Section 19.11 thereof, Heartland has the explicit right to charge
> Merchant for the fees in question.  Prior written notice of the fee
> was provided to Merchant in full compliance with the terms of the
> Agreement as well as applicable law, rules and regulations.  The
> merchant on 02/14/2020 completed a questionnaire that required
> network vulnerability scans as part of its PCI DSS Compliance
> validation.  Scans were never performed, passing, or attested to so
> the merchant never was in compliance status.  The merchant filled
> out the incorrect questionnaire for their payment environment.
> This merchant processes via our Heartland Secure Terminals so the
> merchant should be required to perform the network vulnerability
> scans.  Currently as of today, 02/16/2021 merchant is not
> compliant the questionnaire that they filled out has expired.  The
> fees incurred upon your account are accurate and rightfully due
> Heartland.  A copy of your agreement acceptance has been
> included on pg 2 of this response, so you can see you did in fact
> execute a 36 month agreement and the ETF is due to Heartland.
> **However, Heartland Payment Systems, LLC as a gesture of
> goodwill, has agreed to refund 5 months of Customer
> Intelligence Suite fees $274.75 and 2 months of PCI Non-
> compliance fees $250.00** and agreed to waive the $295.75 and 2
> months of PCI Non-compliance fees $250.00 and agreed to waive
> the $295.00 early termination fee to close the account.  No further
> compensations will be extended and Heartland considers the
> complaint closed.  Sincerely, Heartland Payment Systems
> (emphasis supplied)

122.    On or about January 26, 2021 a merchant named David Creek Ranch, LLC

complained that Heartland had improperly charged the merchant the $125 per month PCI Fee as

well as $54.95 per month for a Customer Intelligence Suite Fee for which the merchant did not

enroll.  Specifically, the merchant complained that:

24

**Apparently a year and a half ago I started getting charge a 125.00 per month non compliant fee unbeknownst to me. They have taken approximately 2625.00 of funds from us.** I have since gone on and gotten my compliance certificate, but am still concerned with the fact that Heartland had no problem charging me the monthly fee but did not try to reach out. Plus they had the wrong email address for me. Apparently at some point on the back of page 2 it stated info about the compliance fee. Then apparently, again was not told this information but if I used the mobile app then I needed to do scans every 3 months which again I was not informed of so that threw me out of being compliant . In the meantime I have probably talked to Heartland at least 30 different times and at no point did anyone ever say did you know you are non compliant. The only way I just found out was because I called to question some other charges and thankfully the customer service rep told me. **Also, again I didn't realize this, but for the past 3 month I was also getting charged another $54.95 a month or customer intelligence suite fee which I didn't sign up for**. So now I am trying to recoup my money and they did give me a 500.00 "loyalty credit" which is way more than apparently they were supposed to. I am still trying to recoup the balance and they are literally just being bullies. We are a small mom and pop business as they are a huge money making corporation. Also, now since I took the loyalty credit if I leave Heartland within the year they "take" back the 500.00 plus charge me another fee of 295.00. I am in no contact with Heartland and I have been a customer of theirs for approximately at least 11 years. They have made plenty of money off of our business. (emphasis ).

123.    On October 6, 2020 a merchant named Creekside Pre-Owned Motors LLC,

complained to the Better Business Bureau (and the BBB forwarded the complaint to Heartland)

about Heartland improperly charging the merchant with a $125 per month PCI Fee as well as a

$68.50 Regulatory Fee and a Customer Intelligence Suite Fee to which the merchant never

agreed.  Specifically, the merchant complained:

**I've been a Heartland client since 2017.  Heartland started charging PCI compliance fees in 2019 and recently charged me a $125/mo PCI non-compliance for 3 months** after I had completed my PCI compliance earlier in the year. I contacted my rep to find out what was going on and was told that I was required to re-attest/certify my compliance, even though nothing was any different than it was when I completed my attestation a few months

earlier. I later received a call from their client management department who was incredibly rude and unprofessional. I requested my money back because not only had I previously completed my compliance survey and attestation, but they were not sending the PCI emails to the correct email address. They refused and said that they would only re-credit me for two months for PCI non-compliance fees if I extended my contract 3 more year, and that if I wasn't happy that I could google the number for their legal department and address it with them. I stopped processing with them on August 31 but was charged another $248.45 in September. **They charged me for: $125 for PCI Non-compliance (after I completed my compliance) 468.50 for Service & Regulatory Mandate - $54.95 for Customer Intelligence suite (which I never signed up for).**

(emphasis added).

124.     On October 7, 2020, Heartland responded by, among other things, refunding $250 of the PCI Fees but declining to refund other monthly fees it had charged. Specifically, Heartland said:

> Heartland Payment Systems, LLC agrees to refund your account $250.00 for the PCI Non-Compliance fees and waive the $295 early termination fee. However,[Heartland] respectfully declines to extend any refund of its rightfully due monthly fees or the Customer Intelligence Suite monthly fee. Your account has been closed effective upon the date of this letter. No further refunds will be extended and Heartland considers the matter closed.

125.     On October 3, 2020 a merchant complained to Heartland, through the Better Business Bureau, that Heartland had improperly enrolled it and charged it for the Customer Intelligence Suite Fee without notifying the merchant. Specifically, the merchant reported:

> I have been using Heartland Payment Systems as my credit card processor for my business. **I found out today that two months ago they added a service (Customer Intelligence) without notifying any of their customers.** When I called inquiring about my statement charges, I was told that the monthly charge started 2 months ago and customers were notified of the new service via tag line on their statements. They are charging for a service that was never authorized.

(emphasis supplied).

126.     In response to the merchant's complaint, on October 7, 2020 Heartland declined

to refund the Customer Intelligence Suite Fees and took the position that Heartland had enrolled

the customer in the program and it was the customer's obligation to cancel the service in order to

avoid being charged.  Specifically, Heartland wrote:

> As a valued customer, Heartland provided you with complimentary
> access to the Customer Intelligence Suite from March 2020 to
> April 30, 2020. At the time that Heartland notified you of this new
> service, Heartland also notified you that if you did not cancel your
> access to the Customer Intelligence Suite prior to April 30, 2020,
> you would be billed $54.95/month for the service, pursuant to
> Section 19.11 of your Merchant Processing Agreement.  Attached
> to this response are copies of the referenced notification found on
> your monthly processing statements and statement insert from
> February. Heartland Payment Systems, LLC respectfully declines
> to extend any refund of its rightfully due fees.

127.     On October 14, 2020 the merchant rejected Heartland's position and criticized

Heartland's practice as deceptive. Specifically, the merchant wrote:

> I am rejecting this response because: Heartland Payment Systems
> is a financial service provider and should be regulated to conduct
> business in a straight-forward honest way. They added a service
> that I did not request and their excuse for not crediting the charges
> back is that I was notified via my statement that I would be
> charged UNLESS I reached out and cancelled a service. Even
> though I never authorized or ordered the product. This is shady at
> best. I wonder how many businesses are being charged for a
> service they never ordered.

128.     Heartland then responded on October 22, 2020 and "as a gesture of goodwill"

agreed to refund $109 to the merchant for two months of Customer Intelligence Suite Fees.

Specifically Heartland said:

> Dear Mr. ********, Heartland Payment Systems LLC
> ("Heartland") disputes the facts and circumstances raised within
> your most recent response to the Better Business Bureau. Pursuant
> to the terms of the Merchant Processing Agreement (the

"Agreement") by and between Heartland and ZZ HOLDINGS LLC ("Merchant"), including without limitation Section 19.11 thereof, Heartland has the explicit right to charge Merchant for the fees in question, Prior written notice of the fee was provided to Merchant in full compliance with the terms of the Agreement as well as applicable law, rules and regulations. Heartland can only reasonably presume you consent to the service in question as you have received multiple notifications to cancel without incurring any fees and you failed to contact Heartland until October 3, 2020. Heartland Payment Systems as a gesture of goodwill, has agreed to refund your account for the 2 months you were charged for the Customer Intelligence Suite $109.00. No additional offers or refunds will be extended and considers this matter closed.

129.    On September 1, 2020, a merchant that ran a handyman service complained that Heartland had improperly charged it a $125 PCI Fee and $54 for a Customer Intelligence Suite fee.  The merchant also complained that Heartland enrolled the merchant in the Customer Intelligence Suite.  The merchant complained that Heartland had lied to it and had improperly charged these fees to the clients.

130.    Specifically, on September 1, 2020 the merchant wrote:

We signed up with Heartland in May of 2018 and was told that it was only for a year and fees wouldn't be what they were. Well needless to say the fees were way higher than what we were told and the contract was for 3 years. We have also had multiple issues with customer service along with other charges. Because of this we stopped processing CC in April of 2019. **Today I received a charge for compliance of $125, which was done, another charge of $54 for a customer intelligence fee that the company automatically signed me up for.** When I called to discuss this issue, I was told that they would not resolve any money issues since I was "not an active client," because I was not actively processing credit cards. I have paid my contracted cost every month without a problem, we just have not used them. They would not help and told me my only option was to continue the contract or pay the cancellation fees of $295. I have been lied to and charged fees that should have never been charged since signing up. This company has been false from the beginning and are not ethical.

(emphasis supplied).

131.     In response, Heartland, as a "gesture of good will" refunded the PCI Fee and one $54.95 Customer Intelligence Suite Fee.

132.     On March 5, 2020 a merchant named Greenhouse on Two Rivers, LLC complained that Heartland charged it a PCI Fee of $125 per month as well as $54.95 per month for a Customer Intelligence Suite Fee which the merchant did not request.  Specifically, the merchant complained:

> Issue 1) The amount of money that the company has collected on our behalf, does not match the amount of money they have deposited into our bank account. We have tried contacting them several times and they keep saying they will look into it and they have not. Issue 2) They started taking out a PCI non-compliance fee of $125.00 a month in April of 2019 and the only notice being a memo on the email statement. Other similar companies were charging a $25.00 fee.  We feel their field representative should have altered us to this fee. My son spent hours becoming complaint and they said he would not be charged after January and he was again in February.  The biggest issue we have is there is no way to contact anyone with any authority to do anything.  People agree the fee was "hidden" and apologize, but can't do anything about it. Issue 3) We are wanting to get out of this company but there is a cancellation fee of hundreds of dollars to do so. Issue 4) They sent another memo in our online statement that they will be adding a new service and starting to charge $54.95 month if we don't call and cancel. Shoddy practice in my mind.

133.     On February 4, 2020 a merchant complained to Heartland about the $125 per month PCI  Fee as well as the $69 Reporting Fee.  Specifically, the merchant told Heartland:

> We began to use Heartland in November of 2017. We were told by the Sales Reps there would be no monthly minimums (they were waived since we do not use credit card processing every month and it would be a poor financial decision to enter into a contract where we have to pay a monthly minimum. We were also told that there is no contract length and no termination fee. I contacted our sales rep when I began to notice us being charged (about 6 months into our usage) for $125.00 a month for not doing any payments. Our sales rep told us she would take care of it, and never heard back. Months later I finally had enough and called Heartland directly.  I

was informed part of the fee we were receiving $69.00 was a report fee by the credit card companies. All we had to do was take a survey when we signed up with it or when I questioned our sales rep about it multiple times. I called to cancel and was charge $295.00 because of early termination fee. I was told by the customer service I would have to take it up with our Sales Rep because if she promised that, then it needs to be refunded by her and her manager. The customer service rep said she would send an email to our sales rep and her manager since we cannot get any response from her and she refuses to tell us who the manager is. Our sales rep later texted to get a good email (even though it has never changed) so her manager could email us regarding this situation. A week later, no response from anyone. I feel as if we wasted enough time trying to get his resolved through the right channels. I have no other option.

134.    In response Heartland refunded one $69 Reporting Fee.  Specifically, Heartland

wrote on February 7, 2020 that:

Heartland Payment Systems, LLC ("Heartland") has reviewed the complaint brought to its attention by the Better Business Bureau. As a gesture of good faith, Heartland waived the ETF$295.00 and you were never charged when you closed the processing account on 01/30/19. Further, Heartland extended a refund of the $69.00 reporting fee on 2/1/2020 prior to this complaint. No additional refunds will be remitted and Heartland considers the matter closed.

135.    On January 23, 2020 a Heartland merchant called Big Dog Motors, LLC

complained to Heartland (through the Better Business Bureau) that Heartland had improperly

charged it the $125 per month PCI Fee and the $69 Reporting Fee. Specifically, the merchant

complained:

Was repeatedly charged fees that were not in original agreement. Was told I was informed on the back page of a statement and via email. Only to find out they inputted my email incorrectly so never received. Also they debit my account and put all notices on a statement you receive after account is debited. Hit me for $125-150 twice because I didn't take a compliance survey twice and I would have done in a timely manner except they didn't have my correct email like all other customers received. Also received a 69 fee which wasn't in original contract but they waived my early

> termination fee because of that. Just want to make people aware
> this is an unethical company.

136.     On January 28, 2020, Heartland issued a $250 refund of the PCI Fee and refused

other refunds. Specifically Heartland wrote to the merchant:

> Heartland Payment Systems LLC ("Heartland") has researched this
> complaint and Heartland disputes the facts and circumstances
> raised therein.  Pursuant to the terms of the Merchant Processing
> Agreement (the "Agreement") by and between Heartland and Big
> Dog Motors LLC ("Merchant"), including without limitation
> Section 19.11 thereof. Heartland has the explicit right to charge
> Merchant for the fees in question.  Prior written notice of the fee
> was provided to Merchant in full compliance with the terms of the
> Agreement as well as applicable law, rules and regulations.
> Heartland Payment Systems as a gesture of good faith, has elected
> to issue a refund for the $250,000 PCI Non-Compliance Fee.  No
> further refunds will be extended and Heartland considers the
> matter closed.

137.     On January 23, 2020 a merchant called River Cities Wireless, Inc. complained to

Heartland through the Better Business Bureau that Heartland had improperly charged it a $69

Reporting Fee to which the merchant did not agree.  Specifically, the merchant complained to

Heartland:

> I called in early January, 2020 to cancel service. I was not under
> any contract. Several days later I received my December statement
> and found an enormous fee called Reporting Fee. I've never seen
> such a charge from a credit card processor and it wasn't included
> in my signed agreement with Heartland when I started service with
> them. I called to dispute the charge and waited the 10 days
> required by then and called back today 1/23/20 and was told it was
> denied. I asked to speak with a supervisor and was told after a few
> moments that since I cancelled the decision stands to deny my
> refund request. I have no signed contract stating that I would be
> charged a 69.00 reporting fee.

138.     In response on January 28, 2020 Heartland returned the $69 Reporting Fee as "a

gesture of good faith" but rejected more refunds.

* * *

> Heartland Payment Systems as a gesture of good faith, has elected
> to issue a refund for the $69.00 reporting fee.  No further refunds
> will be extended and Heartland considers the matter closed.

139.    Upon information and belief, shortly before January 6, 2020, a Heartland merchant called American Automotive Services complained to Heartland (through the Better Business Bureau) that Heartland had improperly charged it a $125 PCI Fee, a $69 Reporting Fee, and a $35.50 Service & Regulatory Mandate Fee.

140.    In response, on or about January 6, 2020 Heartland agreed to refund the $125 PCI Fee but denied any additional refunds.

141.    These examples of merchants complaining about the same unauthorized and improper fees that are at issue here demonstrate Heartland's knowledge that its conduct was improper even before Heartland improperly charged Plaintiffs these same fees.

## Class Allegations

142.    Plaintiffs bring this action individually and on behalf of all other similarly situated merchants as a class action pursuant to the provisions of Federal Rule of Civil Procedure 23, sections (a), (b)(2) and (b)(3).

143.    Plaintiffs bring the claims on behalf of the following Class:

> All Heartland customers who processed credit card or debit card
> transactions through Heartland at any time after 2018 and who were
> charged by Heartland a PCI Non-Compliance Fee, a Reporting Fee, a
> Service and Regulatory Mandate Fee, a Customer Intelligence Suite Fee, a
> Non-EMV Assessment Fee, and/or a Non-EMV Program Fee at issue in
> this action.  Excluded from the Class are merchants who received a full
> refund of these fees prior to the filing of this lawsuit, merchants who
> signed an Application or Agreement specifically identifying these fees,
> and merchants who signed an Agreement with Heartland containing an
> Arbitration Agreement or Class Action Waiver in the original Agreement.

144.     The Class excludes any judge or magistrate assigned to this case, Defendant and any entity in which Defendant has a controlling interest, and Defendant's officer, directors, legal representatives, successors, and assigns.

145.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of these claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

146.     <u>Numerosity:</u> The Class is so numerous that joinder of all Class members is impracticable. Heartland had more than 275,000 merchants who processed with it during the time period at issue in this lawsuit and a large percentage of those merchants were charged the improper fees at issue in this case. As a result, the Class likely includes thousands of Heartland customers.

147.     <u>Typicality:</u> Plaintiffs' claims are typical of the members of the proposed Class.

148.     <u>Adequacy:</u> Plaintiffs will fairly and adequately protect the interests of the Class, and have retained counsel experienced in complex class action litigation. Plaintiffs have no interests which are adverse to those of the Class that Plaintiffs seek to represent.

149.     <u>Commonality:</u> Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

    a.  Whether Heartland breached its contract with its merchants;

    b.  Whether Heartland provided sufficient notice under the contract before imposing the fees at issue in this case;

    c.  Whether Heartland acted in good faith when it substantially increased and imposed its fees;

d.  Whether Heartland violated its Terms and Conditions by imposing the fees at issue in this case without proper notice or without obtaining an amended agreement accepted in writing by the merchant;

e.  Whether Heartland was unjustly enriched by imposing these charges on Plaintiffs and the Class;

f.  Whether Heartland has acted unlawfully by charging these fees to merchants, including Plaintiffs and the other Class members, for Heartland's own benefit;

g.  Whether Heartland has acted and continues to act deceptively, misleadingly, unfairly, unlawfully, and/or fraudulently by retroactively increasing these fees charged to merchants, including Plaintiffs and the other Class members, for Heartland's own benefit; and

h.  Whether Heartland is liable to Plaintiffs and the other Class members for its practice of increasing fees without proper notice.

150.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

151.    Adjudicating these common issues in a single action has important and desirable advantages of judicial economy.

152.    Plaintiffs are members of the Class and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

153.    Class action status is warranted under Rule 23(b)(1)(A) because prosecuting separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

154.    Class action status is also warranted under Rule 23(b)(1)(B) because prosecuting separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

155.    Class action status is also warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

156.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

157.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class at any time before the Class is certified by the Court.

## CLAIMS

### COUNT I

### Breach of Contract

158.    Heartland's Merchant Processing Terms and Conditions provides, in relevant part, that:

> [Heartland], from time to time, **may amend the Schedule of Fees** and the charges set forth in **such amended Schedule shall be effective on the date specified in a written notice thereof**, which

> **date shall not be fewer than fifteen (15) days after the date of notice**. . . .

Terms and Conditions, ¶ 6.2 (emphasis supplied).

159.    Heartland had no right to increase fees without proper notice and without providing the merchant with an amended Schedule of Fees setting forth the charges before Heartland assessed them.

160.    On the front page of each statement, Heartland represented that "Heartland is committed to fair dealings and full disclosure."

161.    Heartland imposed the fees on Plaintiffs and Heartland's other merchants without prior authorization or proper notice and without providing an amended Schedule of Fees before assessing the fees.

162.    Heartland improperly charged each customer tens or hundreds or thousands of dollars per month.

163.    These improper charges violated the requirement that Heartland provide fifteen days' written notice as well as the provision requiring Heartland to provide an amended Schedule of Fees and, therefore, Heartland levied these additional fees improperly against Plaintiffs and other merchants.

164.    Heartland did not provide proper notice, an amended Schedule of Fees, or wait fifteen days before implementing its increased fee, and therefore violated its contract with merchants.

165.    Plaintiffs bring these breach of contract claims under the laws of New Jersey, in compliance with the Terms and Conditions of Heartland's contract with its merchants, which states "This Agreement shall be construed and governed by the laws of the State of New Jersey without regard to legal principles related to conflict of laws." Terms and Conditions, ¶ 15.12.

## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

166.     Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

167.     Plaintiffs bring this claim as an alternative to Plaintiffs' breach of contract claim.

168.     A covenant of good faith and fair dealing is implied in every contract under law.

169.     Implied covenants are as effective components of an agreement as those covenants that are express.

170.     Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term.

171.     To the extent the contract did not prohibit Heartland from imposing the fees at issue in this case, or the fee increases, Heartland utilized its discretion under the contract in bad faith to increase the fees it received from Plaintiffs and the Class.

172.     Heartland imposed and raised its fees arbitrarily, capriciously, and inconsistently with the reasonable expectations of the parties.

173.     Heartland's unreasonable and unfair conduct violated the implied covenant of good faith and fair dealing.

## COUNT III

### New Jersey Consumer Fraud Act

174.     Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

175.     The New Jersey Consumer Fraud Act declares it to be an unlawful practice for "any person" to use an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact ... in connection with the sale or advertisement of any merchandise." N.J.S.A. 56:8-2.

176.     The term "Person" is defined broadly to "include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association." N.J.S.A. § 56:8-1(d). Defendant is therefore a "person" under the Act.

177.     The Consumer Fraud Act protects individuals and businesses alike from unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omissions of material facts.

178.     Such unconscionable commercial practices make Defendant liable to Plaintiffs and the Class under N.J.S.A. 56:8-2, which provides that "[a]ny person violating the provisions of the act shall be liable for a refund of all moneys acquired by means of any practice declared to be unlawful."

179.     Heartland engaged in unconscionable business practices by informing Plaintiffs and the Class that Heartland would only charge certain fees and then later charging the fees without proper notice and without providing the Amended Schedule of Fees.

180.     Heartland unscrupulously hid behind the highly complex billing statements that it sent to its customers and profited by increasing its fees to merchants. Heartland made the charges difficult to uncover by splintering its monthly fees into dozens of different fees, nearly all of which are incomprehensibly described.

181.     Defendant violated the Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, by engaging in unconscionable commercial practices, as alleged herein.

182.    Defendant is further liable to Plaintiffs and the Class for treble damages under N.J.S.A. 56:8-13, 19.

183.    Plaintiffs and the Class are also entitled to recover attorney's fees and costs, as well as treble damages under N.J.S.A. 56:8-19.

**COUNT IV**

**Unjust Enrichment**

184.    Plaintiffs reallege and incorporate by reference the factual allegations set forth above.

185.    Plaintiffs bring this claim in the alternative to their other claims in this Complaint.

186.    Heartland wrongfully enriched itself at the expense of Plaintiffs and the Class by imposing and collecting the fees at issue in this action.

187.    Equity demands that Heartland disgorge itself of the benefit of the wrongfully obtained fees it assessed against and collected from Plaintiffs and the Class, which totals tens of millions of dollars.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand a trial on all claims and demand judgment against Heartland, to include the following:

A.    Certifying the action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    An award of damages to Plaintiffs and the Class, including damages in the increased amount that Heartland charged merchants for fees over and above the fees that

Heartland charged to process transactions during that time period, which damages, upon information and belief, amount to tens or hundreds of millions of dollars, together with treble damages and attorneys' fees;

C.   An order providing injunctive relief to enjoin the conduct about which Plaintiffs complain;

D.   An order declaring that Heartland's unconscionable commercial practices, misrepresentations, omissions and other conduct as alleged herein violate the New Jersey Consumer Fraud Act;

E.   Reimbursement of ascertainable damages in the amount of money paid by Plaintiffs and Class for the improper fees at issue in this action;

F.   Actual damages, statutory damages, attorneys' fees, costs and other relief to Plaintiffs and the Class as provided by New Jersey Consumer Fraud Act;

G.   Pre-judgment and post-judgment interest on such monetary relief;

H.   Such other relief to which Plaintiffs and the members of the Class may be entitled at law or in equity.

Dated:        July 20, 2021            By:    /s/ Olimpio Lee Squitieri
                                            Olimpio Lee Squitieri
                                       **SQUITIERI & FEARON, LLP**
                                       2600 KENNEDY BOULEVARD
                                       JERSEY CITY, NEW JERSEY 07306
                                       TELEPHONE:    (201) 200-0900
                                       FACSIMILE:    (201) 200-9008
                                       LEE@SFCLASSLAW.COM